*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DUSTIN JAMES HAWKINS,

      Defendant-Appellant.

UNPUBLISHED
July 18, 2019

No. 339087
Wayne Circuit Court
LC No. 16-007041-01-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

AARON ALAN MACAULEY,

      Defendant-Appellant.

No. 339249
Wayne Circuit Court
LC No. 16-010164-01-FH

---

Before: TUKEL, P.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

In Docket No. 339087, defendant Dustin Hawkins appeals as of right his jury-trial convictions of assault with intent to do great bodily harm, MCL 750.84, carrying a weapon with unlawful intent, MCL 750.226, felon in possession of a firearm, MCL 750.224f, carrying a concealed weapon, MCL 750.227, and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court imposed a term of imprisonment of two years for the felony-firearm conviction, to be served consecutive to concurrent terms of imprisonment of 95 months to 15 years for the assault conviction, and three to five years for each of the remaining convictions. In Docket No. 339249, defendant Aaron Macauley appeals as of right his jury-trial convictions of the same five charges, plus one count of felonious assault, MCL 750.82. The trial court imposed a term of imprisonment of two years for the felony-firearm conviction, to be served consecutive to concurrent terms of imprisonment of 100 months to 20 years for the

-1-

assault with intent to do great bodily harm conviction, two to four years for the felonious assault conviction, and three to five years for each of the remaining convictions.   We affirm.

## I.  FACTS

These consolidated cases arise from an assault that took place in Detroit on July 22, 2016. The victim, Michael Charles Budish, Jr., testified that he had known Hawkins for 16 years, but had only recently become familiar with Macauley.  The victim participated in a marijuana production operation with Hawkins's brother, which resulted in financial and other related tensions dating back to 2015.  The victim described a state of "[c]onstant threat" and stated that he left the Detroit area in October 2015 but came back twice, one of those times being on July 22, 2016.

According to the victim, he had returned to Detroit on July 22 for about 12 hours when, at approximately 3:30 p.m., Hawkins kicked in the front door of his house in Detroit and demanded money.  The victim called the police, heard glass breaking, then spotted Macauley sitting in the driver's seat of a vehicle blocking his driveway and pointing a small caliber black handgun at him.  The victim further described Hawkins coming "around the house and . . . stabbing [his] tires with a screwdriver or a pick or something to flatten, [or] slash [the] tires." Hawkins and Macauley drove away from the victim's house, but the victim encountered them again a few hours later on a street corner where they threatened his girlfriend with a baseball bat. According to the victim, Hawkins and Macauley spotted and pursued him.  Hawkins aimed a gun at the victim, fired a shot, then retrieved an aluminum baseball bat from the back seat of the car and hit the victim with it before Hawkins and Macauley drove off again.  Soon thereafter, the victim encountered Macauley again, the two exchanged harsh words, Macauley said to his girlfriend, "Baby go get the gun."  She retrieved a gun and gave it to Macauley, who then shot the victim in the left arm.

Hawkins and Macauley were convicted following a joint jury trial.  This appeal followed.

## II.  ASSISTANCE OF COUNSEL

Hawkins argues that his trial attorney was ineffective for withdrawing a motion for separate juries at the joint trial of the two defendants, and for failing to relay a plea proposal to him.  Additionally, defense counsel's performance was deficient for failing to investigate a possible alibi defense.  Hawkins raised these claims in a post-conviction motion in the trial court, which the court denied after conducting a *Ginther*[1] hearing.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law."  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).  The trial court's factual findings are reviewed for clear error, but questions of constitutional law are reviewed de novo.  *Id.*  "In reviewing a defendant's claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel's performance was objectively

---

[1] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Regarding the latter, the defendant must show that the result of the proceeding was fundamentally unfair or unreliable, and that but for counsel's poor performance the result would have been different. *People v Messenger*, 221 Mich App 171, 181; 561 NW2d 463 (1997).

## A.  SEPARATE JURIES

Although "a joint trial of codefendants presenting antagonistic defenses has serious negative implications for the accused," severance is required only where the defense "clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v Hana*, 447 Mich 325, 346-347; 524 NW2d 682 (1994). A primary concern is to avoid putting each defendant in the position where that defendant must seek to establish the culpability of the other, and defend in turn against the other's similarly antagonistic defense, while also defending against the prosecution's case. *Id.* at 349 (citation omitted). Accordingly, "[i]nconsistency of defenses is not enough to mandate severance; rather, the defenses must be 'mutually exclusive' or 'irreconcilable.'" *Id.* An alternative way of addressing these concerns, short of completely separate trials, is a joint trial with separate juries for the respective defendants. *Id.* at 351. The latter approach is what was considered, then abandoned by defense counsel at trial.

Hawkins's trial counsel requested separate juries for the joint trial, and at a pretrial proceeding the trial court stated its intention to empanel separate juries "based on . . . potential conflict of defense." At later pretrial proceedings, however, Hawkins's attorney stated that the request for separate juries was withdrawn because the two defendants were not expected to present conflicting defenses. And during jury selection, Hawkins's trial counsel specified that the possibility of an alibi defense had been abandoned "quite some time ago."

Hawkins argues on appeal that the two defendants depended on "mutually exclusive and irreconcilable defenses,"[2] given that "the core of the evidence offered by [Hawkins] was that he was not involved and that it was Macauley who committed the offense and admitted to the same to Hawkins." Hawkins further contends that his trial attorney ill-advisedly dissuaded him from testifying, thus costing him his opportunity to clear himself by implicating Macauley.

At the *Ginther* hearing, Hawkins testified that defense counsel initially wanted separate juries because "me and my father both . . . told him that [Macauley] . . . [c]alled me on the phone and told me what he had done and . . . told my father what he had done," specifying, "He . . . told me 'I just shot [the victim], what do I do?'" Hawkins added that he had hoped to testify in his defense, "the big reason" for which was that Macauley was facing two charges apart from what Hawkins faced, and Hawkins was concerned that the jury might confuse the two situations. According to Hawkins, defense counsel "kept trying to talk [him] into having one jury" over his protestations. Hawkins further testified that he had "four alibi witnesses that [would put him] at four different spots during the whole day[;] that [he was] not with [his] co-defendant. So [they]

---

[2] We observe that Macauley's attorney never joined in the campaign for separate juries.

had totally different defenses." Hawkins detailed how, had he testified, he would have placed himself at various locations away from Macauley throughout the day in question.

As the prosecution points out, the two defendants were charged with various crimes, not over just one incident presenting a question of identity as between them, and Macauley's purported statement to Hawkins only comported with the evidence at trial, where no one suggested that Hawkins, as opposed to Macauley, shot the victim.

Further, Hawkins's trial attorney testified at the *Ginther* hearing that "eventually a decision was made not to have two juries because neither defendant was going to testify," and "it was discussed at length for at least three weeks before trial." Counsel added that his pretrial notes indicated that Hawkins "preferred not to testify," and "[they] agreed that those antagonistic defenses were not going to present themselves."

"Although counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011), citing *Jones v Barnes*, 463 US 745, 751; 103 S Ct 3308; 77 L Ed 2d 987 (1983).

Contrary to his position at the *Ginther* hearing and on appeal, Hawkins placed on the record at trial his decision not to testify. The trial court resolved the conflict at the end of the *Ginther* hearing by declaring Hawkins "incredible," while crediting his defense attorney from long experience as "a fine professional" whom the court had never known to lie. Unsuccessful criminal defendants not uncommonly allege that counsel's advice on whether to testify rendered counsel's assistance ineffective. See, e.g., *People v Tommolino*, 187 Mich App 14, 15; 466 NW2d 315 (1991). But to make issue of that decision on appeal is simply to ask for the chance to try an alternate strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Barnett*, 163 Mich App 331, 338; 414 NW2d 378 (1987); see also *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

Hawkins asserts that it is "unclear . . . what, if any, strategic advantage was the use of one jury," but joint trials of codefendants are the norm, with bifurcation of proceedings taking place only where there is good reason to depart from that norm. The question, then, is not whether there was a strategic advantage in having one jury, but rather whether defense counsel failed to pursue some strategic advantage in having separate juries. Hawkins offers no such theory apart from second-guessing the decision that he made not to testify.

For these reasons, Hawkins fails to show that agreeing to proceed with the joint trial before a single jury constituted deficient performance on the part of his trial attorney.

### B. COMMUNICATION OF PLEA OFFER

Hawkins argues that trial counsel was ineffective for having failed to communicate a plea offer. Whether to accept a plea bargain joins whether to testify as a decision for a defendant to make personally, with the advice of counsel. See *Jones*, 463 US at 751 (a defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal").

At the *Ginther* hearing, Hawkins testified that he declined an offer involving "five, plus two," but that "a couple of weeks before trial" there was talk of "something about a . . . two plus two," which the prosecutor made known was "not official," and which defense counsel "told me basically that we're not taking that." Hawkins argues that defense counsel should have given him a better opportunity to consider taking the latter offer, but the prosecution points out that the record includes no indication that any such proposal was offered, and Hawkins's own admission that the prosecutor disclaimed there being anything official behind talk of a plea bargain putting the sentence at "two plus two" fairly quells any concern that such a plea proposal came about that entirely escaped record notice.

Because the record does not substantiate that any actual plea bargain was offered that defense counsel allegedly failed to communicate to Hawkins, his claim of ineffective assistance of counsel fails.

## C. PREPARATION

Hawkins argues that the trial court erred by failing to appreciate that trial counsel's performance was deficient for failure to investigate and develop an alibi defense.

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). To overcome that presumption, a defendant must show that counsel's failure to prepare for trial resulted in counsel's remaining ignorant of substantially beneficial evidence that accordingly was never presented. *People v Caballero*, 184 Mich App 636, 640, 642; 459 NW2d 80 (1990).

At the *Ginther* hearing, Hawkins's defense attorney testified that "early on when [he] met with [Hawkins] there was an alibi discussed," but that such an approach proved problematic, explaining:

> It's my understanding that Dustin Hawkins thought originally that he and Amanda Chaney and somebody . . . that he might have met before the movies were at a movie theater Downriver I thought on the day of the incident . . . . And as that developed I asked him to try to go to the theater and ask Amanda Chaney, specifically she volunteered to go to the theater and try to obtain the video. And Dustin was out, too. To try to go get video or come up with ticket stubs to show that they were at the theater at that time. Late in the case shortly before trial, and a lot of evidence came in very late in this case. It was very disappointing. So there were a lot of curve balls so to speak at the end. Late in the case we got . . . records that showed . . . Dustin Hawkins' cell phone in the vicinity or in the neighborhood and not at a Downriver theater at that time. So it would have been embarrassing and damaging to the defense to present such an alibi when, in fact, his phone was nowhere near a theater Downriver.

In light of defense counsel's explanations of why the alibi defense was considered, then abandoned, Hawkins's contention is simply a request to this Court to assess defense counsel's

performance with the benefit of hindsight. See *LaVearn*, 448 Mich at 216; *Barnett*, 163 Mich App at 338. But "[t]hat in hindsight a strategy was not completely successful does not render it unreasonable and does not render counsel's assistance ineffective." *People v Trakhtenberg*, 493 Mich 38, 63; 826 NW2d 136 (2012).

Hawkins states that he identified six alibi witnesses and names five as having provided affidavits asserting that defense counsel never made inquiry of them. However, "the failure to interview witnesses does not itself establish inadequate preparation." *Caballero*, 184 Mich App at 642. Further, no such affidavits were offered into evidence at the *Ginther* hearing, and Hawkins does not specify the ostensibly exculpatory accounts that any of those witnesses would have offered. However, at the *Ginther* hearing, defense counsel mentioned some of them in the course of explaining that attempting to establish that the car implicated in the incident in question was parked in one place all day proved unavailing "because it would have looked like nobody could place it there for . . . a full day," but also because "it would be like . . . his buddy[] was hiding the . . . car," and thus that "we finally concluded that, that testimony would have been more damaging than helpful." Hawkins offers no explanations of what defense counsel might have gained from further pursuing his supposed alibi witnesses to counter the reasons counsel provided at the *Ginther* hearing for concluding that Hawkins's attempt to establish an alibi would more likely backfire than succeed.

For these reasons, Hawkins has failed to overcome the strong presumption that defense counsel's strategic decision to forgo an alibi defense was sound trial strategy. See *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999).

## III. HEARSAY

Hawkins argues that the trial court erred by overruling a hearsay objection to presentation of evidence that attributed to the victim statements he made to the police. A trial court's evidentiary decisions are reviewed for an abuse of discretion. *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). "A trial court abuses its discretion when it fails to select a principled outcome from a range of reasonable and principled outcomes." *People v Kahley*, 277 Mich App 182, 184; 744 NW2d 194 (2008). However, a trial court's factual determinations underlying its evidentiary decisions are reviewed for clear error. MCR 2.613(C); see also *People v Beuschlein*, 245 Mich App 744, 748; 630 NW2d 921 (2001). "A finding is clearly erroneous if, after a review of the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gistover*, 189 Mich App 44, 46; 472 NW2d 27 (1991).

A police officer testified that he responded to "a shooting scene in the area of Archdale and Whitlock" with his partner, and added that their car was equipped with a dashboard camera, and that both officers wore body microphones. The officer testified that he encountered the victim, who had a gunshot injury, was "[f]rantic," and who spoke to others at the site. A brief portion of an audio recording that captured some of the events that took place in the aftermath of the shooting was played. After another brief excerpt was played, the prosecutor stated, without contradiction, that "a male voice . . . just said, Hawkins," and also spelled the name and indicated where he lived. The officer recognized the voice as that of the victim.

Hearsay, meaning testimony relating a person's unsworn, out-of-court assertions offered to prove the truth of the matter asserted, MRE 801(c), is generally inadmissible, MRE 802, subject to several exemptions and exceptions as provided by the rules of evidence, MRE 801-805. It is undisputed that what the victim told the police officer at the scene of the shooting was hearsay. The trial court concluded that the challenged evidence was admissible under the exception set forth in MRE 803(2) for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In challenging that decision, Hawkins cites *People v Gee*, 406 Mich 279, 282; 278 NW2d 304 (1979), in which our Supreme Court stated that the application of that exception required that the statement "be made before there has been time to contrive and misrepresent," then argues that "there was no evidence that the statement" here challenged "was made before there was time to misrepresent." However, the Court later clarified that the latter statement from *Gee* "is simply a reformulation of the inquiry as to whether the statement was made when the witness was still under the influence of an overwhelming emotional condition." *People v Straight*, 430 Mich 418, 425; 424 NW2d 257 (2010). Here, the victim stated that he did not remember telling the police what had happened when the police appeared at the shooting site, because he was still in shock at the time, which shock wore off "pretty much once [he arrived at] the hospital." When further questioned about what he told the police, the victim added, "I was obviously just shot after a traumatic experience, so I don't remember exactly." The victim's testimony concerning his mental state at the time thus strongly militates against "a definite and firm conviction that a mistake has been made" in connection with the trial court's determination that he was still under the stress of having been shot when he spoke to a police officer while still at the site of the shooting. *Gistover*, 189 Mich App at 46.

Hawkins argues that there was no testimony from the police officer the victim spoke to concerning his demeanor, but cites no authority for the proposition that only the person spoken to, as opposed to such other evidence as the declarant's own testimony, can form the basis for determining the declarant's continuing state of excitement. Hawkins additionally points out that the victim offered the statements at issue in response to police questioning, but cites no authority for the proposition that a person cannot be deemed still under the stress of a startling event if answering questions about it. In contrast, the prosecution cites *People v Sanders*, 163 Mich App 606, 611; 415 NW2d 218 (1987), in which this Court opined that "[a]lthough certain of the victim's utterances were in response to the officer's questioning, they were nonetheless made while the victim was under the stress of the excitement."

For these reasons, we reject the challenge to the trial court's decision to admit the challenged evidence as an excited utterance.[3]

---

[3] Because we are satisfied that the trial court did not abuse its discretion by admitting the evidence under the hearsay exception for excited utterances, we decline to consider the propriety of the trial court's alternative conclusion that it was admissible under the exception set forth in MRE 803(24) for statements not otherwise covered by the enumerated exceptions "but having equivalent circumstantial guarantees of trustworthiness."

## IV.  OFFENSE VARIABLE 14

Hawkins argues that the trial erred in its scoring of the sentencing guidelines by assessing him 10 points for having acted as a leader in the criminal conduct at issue.  We disagree.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.*

The court assessed 10 points for Offense Variable (OV) 14, as directed where the defendant was the "leader in a multiple offender situation."  MCL 777.44(1)(a).  A "multiple-offender situation" is "a situation consisting of more than one person violating the law while part of a group." *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated in part on other grounds, 494 Mich 880 (2013).  A leader is "one who is a guiding or directing head of a group." *Id.*  To determine if a defendant was the leader, the entire criminal transaction must be evaluated.  MCL 777.44(2)(a); *People v Lockett*, 295 Mich App 165, 184; 814 NW2d 295 (2012).

At sentencing, the trial court evaluated the entire criminal transaction and pointed to specific facts in the record to find that Hawkins was "definitely the leader."  The trial court considered that the objective of the crime was to collect a debt for Hawkins's father, and noted that Hawkins drove his tenant, Macauley, to the scene and kicked in the victim's door.  Hawkins's actions went beyond mere aggression and determination, because he initiated the criminal transaction.  He drove himself and Macauley to the victim's house to enforce his family's financial interest through extrajudicial means, and started the threatening behavior by kicking in the victim's door.  Hawkins's interests and behavior escalated the situation and set the tone for the violent assault that followed.  Although there were multiple offenders involved in the events that night, the trial court declined to consider whether it would be appropriate to find that there were multiple leaders. *People v Rhodes (On Remand)*, 305 Mich App 85, 88; 849 NW2d 417(2014) ("Multiple defendants may be considered leaders . . . if there are at least three offenders involved," but where "the record only supports a finding that two offenders were involved, only one individual may be considered a leader . . . .").[4]  Instead, when the prosecution posited that there were multiple leaders, the trial court stated, "Well I'm not going to rely on that argument . . . ."  The trial court recounted Hawkins's actions of driving the car, and kicking in the door, and concluded, "And I'm going to award ten points with regard to the matter.  I think he was definitely the leader in this matter."

---

[4] Notably, there is no discussion of OV 14 in Macauley's sentencing transcript, nor was Macauley's sentencing scoring sheet or presentence investigation report included in the record on appeal.  Accordingly, the record is devoid of any evidence that the trial court actually assessed both Hawkins and Macauley each 10 points for OV 14.  More importantly, Hawkins has not raised any such argument on appeal.  This Court generally does not address issues not raised on appeal.  See *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004).

In light of these facts, the trial court properly concluded that Hawkins was a leader, and he was properly scored 10 points for OV 14.

## V. OTHER BAD ACTS

Hawkins takes issue with the trial court's refusal to declare a mistrial in response to certain improper testimony that the victim injected.[5] We review a trial court's decision on a motion for a mistrial for an abuse of discretion. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995).

MRE 404(b)(1) establishes that evidence of other bad acts is not admissible to prove a person's character in order to show behavior consistent with those other wrongs, but provides that such uncharged conduct may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, scheme, plan or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . ." MRE 404(b)(2) in turn requires that a prosecutor wishing to introduce such evidence provide notice of that intent. See also *People v VanderVliet*, 444 Mich 52, 89; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

This issue concerns the victim's references to a prior assault with a baseball bat in the hands of Hawkins and Macauley. Counsel for Hawkins objected to such testimony because there had been no notice of intent to use such evidence of other bad acts, the trial court impliedly agreed, and the prosecutor did not argue otherwise. Because this issue concerns not the admissibility of the testimony at issue, but rather the adequacy of the trial court's response to it short of declaring a mistrial, review of all the objectionable testimony is in order.

When the victim was asked if a certain acquaintance of defendants joined the latter in trying to collect money from him, the victim answered, "Only the time that they broke in and tried to assault me with a baseball bat that I never reported." This initial mention of the earlier incident passed with no further ado.

When the prosecutor asked the victim why he left town in late October 2015, the witness answered, "Because they broke into my house and beat me with a baseball bat," then specified both defendants, among others. The prosecutor began asking further about "the first breaking in of your house in October" when Macauley's attorney objected that "[h]e didn't say when it was," and Hawkins's attorney raised an objection under MRE 404(b). The prosecutor elected to move onto other questioning, and the trial court agreed to "strike those questions and answers" and instructed the jury to disregard them. Counsel for Macauley later moved for a mistrial after the jury was excused for lunch. The trial court denied the motion on the ground that it had provided a "sufficient remedy."

---

[5] Macauley argued this issue under the rubric not of challenging the trial court's denial of a mistrial, but of challenging the trial court's denial of a post-trial motion for a new trial, which for this purpose presents a distinction without a difference.

After lunch, Hawkins's attorney elicited that the victim did not know Macauley before the subject shooting, then asked if he had ever had any disagreements with Macauley, to which the victim answered, "Except for when he came in my house and tried to beat me with a baseball bat." Counsel reminded the victim that such testimony had been stricken, and the trial court stated, "We're going to strike that again," and again instructed the jury to disregard it.

Later in the cross-examination, the victim recounted where, during the incident in question, after Macauley shot at him, Hawkins "grabs a bat from the back seat," and continued, "He left the door open and came running at me and I was running from him because he has already hit me with a bat before." The trial court held a bench conference and excused the jury, then asked about the proper remedy in light of the additional improper testimony. The prosecutor suggested that the court "clearly instruct" the witness not to refer again to that "previous incident." Counsel for Macauley objected and again requested a mistrial. The trial court again denied the motion, but agreed to follow Hawkins's counsel's suggestion not to mention the matter to the jury again, but to instruct the witness not to speak of the earlier assault with a bat. The court then admonished the victim, "You are not ever, ever, ever to again mention on the witness stand this incident that took place . . . with regard to a baseball bat beating you approximately a year before this incident." The victim completed his testimony with no further such references.

"A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant, and impairs his ability to get a fair trial." *Haywood*, 209 Mich App at 228. However, not every instance of mention before a jury of some inappropriate subject matter warrants a mistrial. Specifically, "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *Id*. "As a general rule, unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990). In this case, Macauley asserts that the prosecutor "sought" or "elicited" the problematic testimony, but neither explains why the record compels imputing such mischief to the prosecutor where there was no such suggestion at trial. We are satisfied that all indications in the record are that the prosecutor was readily dissuaded from the start from trying to make capital of the earlier alleged assault with a baseball bat.

As noted, the trial court initially instructed the jury to disregard the offending testimony, but refrained from reiterating the instruction when the error was repeated in deference to Hawkins's attorney with the acquiescence of Macauley's attorney. "Jurors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Hawkins emphasizes that the jury repeatedly heard about the alleged earlier assault with a bat, but as the trial court's curative instruction indicated, the jury was expected to *disregard* the offending testimony, not forget it entirely. Accordingly, if all those reminders made it all the harder for the jurors to put the matter out their minds, the jurors should nonetheless have retained the admonishment not to let it affect their deliberations. A criminal defendant is entitled to a fair trial, not necessarily a perfect one. *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992).

For these reasons, defendants fail to show that the trial court abused its discretion by deciding that the challenged irregularity did not warrant scrapping the proceedings in progress and beginning anew.

## VI. MOTION FOR A NEW TRIAL

Macauley argues that the trial court erred by denying a motion for a new trial. In addition to the matter of the victim's repeatedly mentioning an earlier assault with a baseball bat, discussed in Part V, *ante*, Macauley argues that a new trial was warranted in response to jury misconduct, and also the prosecution's failure to produce two endorsed res gestae witnesses. He contends that the latter irregularity denied him a fair trial.

MCR 2.611(A)(1) authorizes a trial court to grant a new trial for a party whose "substantial rights are materially affected" as the result, under Subparagraph (a), of "[i]rregularity in the proceedings of the court, jury, or prevailing party, or an order of the court or abuse of discretion which denied the moving party a fair trial," or, under Subparagraph (b), of "[m]isconduct of the jury or of the prevailing party." A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). Underlying factual findings, however, are reviewed for clear error. *Id.*, citing MCR 2.613(C).

## A. JURY MISCONDUCT

After the jury was empaneled, and instructed not to discuss the case before deliberations, one juror came forward and admitted that "there was some I would say discussion about what we've seen so far here," and explained as follows:

> We talked about breaking and entering and home invasion, some of the things that you had said and some of the opinions or I should say, some of the interpretations of what that mean. We talked about how people had been wrongfully committed. One . . . lady and I couldn't pick her out if she was standing here right in front of me now said something about somebody that had been in prison for twenty-eight years and . . . then was released because he had been wrongfully convicted. We talked about the tattoos that both defendants have. They . . . were noticed and they were discussed. That discussion was I think probably very relevant, but only maybe twenty seconds or so.

The court asked for elaboration, and the juror stated, "Just how they both have tattoos on their neck. And . . . there was hey, did you see, can you tell what that is kind of thing," but also that "there was the mention of a brotherhood type thing" and "everybody was involved in the discussion." Defense counsel declined the invitation to ask any further questions, and the court reiterated to the jury that there was to be no discussion about the case at present. The court then asked, "Can everybody still give both sides or give all sides a fair trial in this matter?" and "Can everybody give a fair trial?," with the jury answering both questions with a collective "Yes." The trial court then asked, "Is there anybody that cannot give a fair trial after those discussions? Anybody? The court then asked if counsel was satisfied to proceed with trial. All three advocates expressed satisfaction.

In denying Macauley's motion for a new trial, the trial court explained why it did not regard this irregularity as warranting a new trial:

> I'll start with the issue . . . whether or not defendant was entitled to a new trial due to the actions taken by the jurors prior to being sworn in and whether or not that should have resulted in a mistrial.
>
> I don't think anybody at all has ever brought up there was ineffective assistance of counsel . . . , and so I am not going to address it . . . . But in this case after we heard about this from the jury . . . I brought the panel back in and told them not to discuss anything about the case and then I asked them whether they could still give . . . all sides a fair trial in this matter. They all answered affirmatively. . . .
>
> Then I asked, "Is there anybody that cannot give a fair trial after these discussions, anybody? Alright. Is counsel satisfied with what I have instructed the jury and that we can proceed with the trial?' [The prosecuting attorney], "Yes, Judge." [Hawkins's attorney], Yes Your Honor." The Court, "Anything additional you want me to say or add?" [The prosecuting attorney], "No, I don't believe so." The Court, "Counsel, are you satisfied?' [Macauley's attorney] said "No, Your Honor."
>
> Based on that I think . . . that took care of the issue.
>
> \* \* \*
>
> . . . I don't think the interest of justice or preventing a miscarriage of justice would require the Court to order a new trial with regard to that issue.

We hold that defense counsel's participation in the discussion on how to deal with that irregularity, and unequivocal acceptance of the remedy provided, constituted an affirmative waiver, thus extinguishing appellate objections. *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000); see also *People v Roberson*, 167 Mich App 501, 517; 423 NW2d 245 (1988) ("Defendant should not be allowed to assign error on appeal to something which his own counsel deemed proper at trial. To do so would allow defendant to harbor error as an appellate parachute.").

Alternatively, mere discussion of defendants' tattoos before deliberations does not result in some kind of unreasonable prejudice. Macauley argues that the trial court should have questioned the jurors individually about any resulting biases, rather than rely on their collective affirmative response when asked if they could still give defendants a fair trial, but the court was not asked to take that additional step below, and Macauley offers no empirical basis for questioning the trial court's satisfaction with the collective "yes" it received.

Macauley also argues that defense counsel "was ineffective for agreeing to this resolution," but does not develop that argument beyond that simple assertion. " 'An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of

-12-

supporting authority.'" *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009), quoting *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Moreover, as Macauley acknowledges, the improper predeliberation discussions included "how people had been wrongfully committed," which itself reveals a concern among the jurors that could only benefit the defense.

For these reasons, Macauley fails to show that the trial court erred in how it responded to indications that there was some improper discussion among the jurors before trial.

### B. MISSING WITNESSES

Near the start of the fifth day of trial, Macauley's attorney expressed concern over two endorsed prosecution witnesses whom the prosecution had failed to produce. The prosecutor offered the following explanation:

> There was a[n] amended witness list that was filed . . . I believe . . . the day after our originally scheduled trial date. That reflected dropping [a police officer] off the witness list because he was not going to be available for this particular trial date that was set.

> Prior to that trial [a detective] made multiple efforts over the course of I think about three weeks prior to that trial trying to locate [the two witnesses]. He was not successful. He made repeated attempts to go to those homes. . . . He did . . . the regular searches that police do in these matters to try to locate people. He was not successful as of the trial date. I instructed him to continue to try to serve these people. He did and we had a conversation in April that he was still unsuccessful in finding these people, which let [sic] me to create another amended witness list . . . , which reflected that I would not be producing [the two witnesses] because we could not locate those individuals.

> Judge, I honestly don't know what happened. . . . [A]pparently I didn't file it. . . . I don't know how that oversight happened and I candidly admit that I have no record of it being filed. . . . .

> It was brought to my attention yesterday . . . when it became clear that they did not have the . . . amended witness list that I was operating off of. We immediately dispatched [a detective] to go try to find these people[, who] indicated to me that he spent the afternoon and the late evening hours trying to locate these people . . . .

Macauley's attorney stated, "I am a little fluxed as to what remedy I should be requesting other than mistrial because they are witnesses that at least in part based on written statements that we have contradicts [the victim] and . . . some of the other witnesses," and added that she did not favor simply reading those statements because "I would like to cross-examine them." When the trial court offered to provide the missing-witness instruction, counsel responded, "It's a great instruction and . . . certainly if the Court does not grant my other remedy I think . . . that's fine."

Counsel then further protested as follows:

-13-

Had we been aware of the fact that these witnesses couldn't be found I certainly would have seen [sic] my investigator . . . out looking for them. And so you know they are witnesses that in many ways favor the defense in terms of the contradictory testimony. And . . . the instruction . . . just says that they would have been favorable, but in what way? So without that here the jury doesn't get the full picture.

And . . . those two witnesses . . . were talked to by the police a couple of days after the incident. Not four or five months later, but a couple of days after the incident. So . . . I guess I'm asking the Court again for a mistrial because the witnesses are not going to be presented and I feel that my client's case is severely prejudiced by that, and I can't think of any other remedy . . . that would cure that.

The prosecutor then offered to stipulate to the admission of written statements attributed to the missing witnesses, but defense counsel inveighed, "Juries need to hear witnesses and see them and they need to be examined and cross-examined just like we have done with all of the other witnesses that were found by the police and questioned four months after the incident." The trial court denied a mistrial as "too severe a remedy with regard to this." Macauley's attorney continued, "[O]ne of the witnesses said that the male, who obviously could be inferred as [the victim] . . . , was taunting and saying shoot me, shoot me. And . . . the other witness clearly says that [the victim] walked by with a steak knife and returned after being shot." Counsel added, "Because I'm co-counsel I don't think I'm in a position to indicate what my discussions were with the prosecuting attorney, but I think the negative inference instruction may suffice."

At the start of the next day of trial, the prosecutor reported that, "in regard to the two missing witnesses, the police were unable to locate them over the weekend," and he further discussed regarding the proper remedy. In the end, the parties stipulated that a statement attributed one of the witnesses would be read into the record, and that the trial court would provide a negative-inference instruction to the jury in connection with the other one.

When the jury was present, the trial court advised that a stipulation was forthcoming, and the prosecutor, with the stated approval of both defense attorneys, stated as follows:

Judge, the parties would stipulate that if [a certain missing witness] were called to testify she would testify the following: "I saw the white male with tattoos walk by my house hold a steak knife and then turned down [the street]. As I lost sight of him around the corner I heard two shots go off. The male with the knife came back running bleeding from the arm."

The court went on to include among its final jury instructions that the other witness at issue "is a missing witness whose appearance was the responsibility of the prosecution. You may infer that the witness' testimony would have been unfavorable to the prosecution's case."

At the hearing on the motion for a new trial, after initially showing reluctance to concede that a stipulation had been offered, Macauley's appellate counsel finally admitted that "defense counsel after hesitation did agree to the stipulation that [one witness's] testimony would be read

into the record and the Court would read the adverse witness instruction for [the other witness]." Macauley asserts that counsel was ineffective "for agreeing to this procedure."

As if to anticipate an eventual challenge to Macauley's defense attorney's performance, the trial court stated:

> I found [Macauley's defense attorney] to be very, very affective [sic] as a counsel and she always has been affective in this courtroom and she has a reputation throughout this building of being affective counsel. I think the defendant was fortunate to have her as his attorney and I thought she did an extraordinarily good job for him.
>
> She stipulated to the one witness' testimony being read and the other testimony I gave the . . . [a]dverse instruction with regard to the missing witness. So for those reasons . . . I don't think that the interest of justice or preventing miscarriage of justice would . . . allow a new trial based on those arguments . . . .

We remain mindful that Macauley's defense attorney actually requested a mistrial over the missing witnesses, then only agreed to the procedure actually taken as her best strategic response to the court's denial of the mistrial.

Macauley argues that the prosecution failed to exercise due diligence in procuring the witnesses in question, but offers no answer to the prosecutor's extensive recitations of efforts to locate those witnesses, which apparently satisfied defense counsel at trial, who complained of a lack of notice but not of due diligence. Macauley argues repeatedly that he was improperly denied his right to confront and cross-examine the missing witnesses, but specifies neither what damaging testimony thus went unchecked, nor what beneficial testimony might have been elicited from cross-examination. Macauley also complains that he was not given the opportunity to participate in deciding whether to agree to have a witness's statement read into the record, and imputes error to the trial court, and ineffective assistance of counsel to his trial attorney, in the matter. But he again fails to indicate how he suffered any disadvantage in the matter. He also cites outdated authority for the proposition that waiver of certain confrontational rights is a defendant's personally to make on a knowing and intelligent basis. In fact, the applicable rule is that "if the decision constitutes reasonable trial strategy, which is presumed, the right of confrontation may be waived by defense counsel as long as the defendant does not object on the record." *People v Buie*, 491 Mich 294, 315; 817 NW2d 33 (2012).

The prosecution's failure to produce two res gestae witnesses, from whom the defense might have elicited useful testimony, was a serious irregularity. However, given that the statement read into the record on behalf of one of the witnesses described only a person carrying a steak knife before coming back into view with an apparent gunshot wound, and that the jury was told about the other only insofar that it was invited to presume that her testimony would have been unfavorable to the prosecution, the trial court did not abuse its discretion by concluding that the prosecution's failure to produce those two witnesses neither impaired Macauley's ability to get a fair trial, see *Haywood*, 209 Mich App at 228, nor constituted an irregularity in the proceedings that materially affected his substantial rights, see MCR

-15-

2.611(A)(1). See also *Mosko,* 441 Mich at 503 (a criminal defendant is entitled to a fair trial, not necessarily a perfect one).

For these reasons, Macauley has not shown that the trial court's decision to deny his motion for a new trial fell outside the range of reasonable and principled outcomes. See *Kahley,* 277 Mich App at 184.

## VII. SEARCH AND SEIZURE

Macauley asserts that certain cell phone records of his were obtained without a warrant and so should not have been admitted at trial.

Not in dispute is that evidence obtained in the course of a violation of a suspect's rights against unreasonable searches and seizures under the Fourth Amendment of the United States Constitution[6] is subject to suppression at trial. *People v Cartwright,* 454 Mich 550, 557-558; 563 NW2d 208 (1997); see also *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961) (incorporating the Fourth Amendment against the states under the Fourteenth Amendment). "Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Borchard-Ruhland,* 460 Mich 278, 293-294; 597 NW2d 1 (1999).

Macauley urges retroactive application of federal caselaw holding that acquisition of a defendant's cell-site location information was a search for purposes of the Fourth Amendment, and thus that "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Carpenter v United States,* ___ US ___; 138 S Ct 2206, 2221; 201 L Ed 2d 507 (2018). But Macauley does not describe, or provide record citations to show, just what cell phone records were admitted into evidence, let alone what information they provided to the jury. Our own examination of the transcripts turned up no such records attributable to Macauley that were entered into evidence.[7] For these reasons, Macauley has no basis for appellate relief based on this issue.[8]

---

[6] See also Const 1963, art 1, § 11.

[7] We note that a police officer testified that a cell phone seized from Hawkins, and searched under the authority of a warrant, revealed a social media message apparently from Macauley in which the latter stated, "Makes me nervous that he knows my van now. Should have drove your sh*t because n all. I'll go straight to it if sh*t gets done now. Not playing that sh*t," but we note also that any challenge to the admissibility of that evidence on Fourth Amendment grounds was not Macauley's to offer. See *People v Zahn,* 234 Mich App 438, 446; 594 NW2d 120 (1999) ("[u]pon delivery, the sender's legitimate expectation of privacy terminates").

[8] We note that under this Court's recent holding in *People v Coleman,* ___ Mich App ___; ___ NW2d ___ (2019) (Docket Nos. 339482 & 340368), each defendant's felony-firearm sentence may run consecutive to only one underlying predicate felony. However, neither defendant has raised this issue, and the record indicates that to remand for resentencing may enlarge

-16-

## VIII.  CONCLUSION

Affirmed.

/s/ Jonathan Tukel
/s/ Kathleen Jansen
/s/ Michael J. Riordan

---

defendants' sentences.  Accordingly, we will not raise this issue sua sponte, and leave it to the defendants to raise the issue respectively and to seek correction of their invalid sentences via MCR 6.500 *et seq.* should they choose to do so.  *Paschke v Retool Industries (On Reh)*, 198 Mich App 702, 705; 499 NW2d 453 (1993), rev'd on other grounds 445 Mich 502, 519; NW2d 441 (1994) ("The court is *obligated* only to review issues that are properly raised and preserved; the court is *empowered*, however, to go beyond the issues raised and address any issue that, in the court's opinion, justice requires be considered and resolved.") (emphasis in original).